UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

SARAH MYSZEWSKI,

          Plaintiff,

        v.                                 Case No. 07-C-0487

WISCONSIN AVIATION, INC.,

          Defendant.

## DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND SETTING STATUS CONFERENCE

       Plaintiff, Sarah Myszewski, claims that defendant, Wisconsin Aviation, Inc., violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, when she was fired. Wisconsin Aviation moves for summary judgment and dismissal of this lawsuit.

       Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of her cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

       The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-

48.  "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).  Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323.  To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in her favor.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

FACTS

The following facts are either undisputed or taken in the light favorable to Myszewski.  Generally, a cite to a proposed finding of fact alone indicates that the fact was undisputed.  Disputed proposed findings of facts are ordinarily referenced with a party's response noted.[1]

Jeff Baum is the president of Wisconsin Aviation, Inc., which provides a complete line of aviation-oriented services including air charter, corporate aviation management, aircraft sales, maintenance, rental and instruction. (PPFOF ¶ 43; DPFOF ¶ 3.)  Between January 2004 and September 2005 Wisconsin Aviation employed about fifty-five individuals.  (PPFOF ¶ 3.)

Sarah Myszewski, is female and was employed by Wisconsin Aviation between January 12, 2004, and September 15, 2005, at its Watertown, Wisconsin, location.  (Pl.'s Am. Resp. ¶ 30; PPFOF ¶¶ 1, 5; Comp. ¶ 3; Answer ¶ 3.)  Myszewski was

---

[1]Defendant's proposed findings of fact are identified as "DPFOF," while plaintiff's proposed findings of fact are identified as "PPFOF."  Plaintiff's Amended Response to Defendant's Proposed Findings of Fact is referred to as "Pl.'s Am. Resp."  Defendant's response to plaintiff's amended proposed findings of fact is referred to as "Def.'s Resp."

2

hired as a full-time aircraft mechanic.  (DPFOF ¶ 32.)  Her duties consisted of performing maintenance on Wisconsin Aviation's aircraft.  (PPFOF ¶ 6.)

There were eight full-time aircraft mechanics at Wisconsin Aviation's Watertown location between January 12, 2004, and September 15, 2005:  Myszewski, Tim McGuire, Ben Pitterle, Doug Siebel, Craig Stanly, Steve Veum, John Weigand, and Scott Yeager.  (DPFOF ¶¶ 36-37; PPFOF ¶¶ 22-24.)  Myszewski was the only female aircraft technician at Wisconsin Aviation throughout her employment.  (PPFOF ¶ 7.)

Shortly after her start date, Myszewski transitioned to second shift.  (PPFOF ¶ 158.)  At some point in 2004, Wisconsin Aviation set Myszewski's work hours as 10:30 a.m. to 7:00 p.m.  (PPFOF ¶ 159.)

Peter Schroeder was employed by Wisconsin Aviation as its Director of Maintenance from 1990 until April 2008.  (DPFOF ¶ 23; Pl.'s Am. Resp. ¶ 23; PPFOF ¶ 9.)  Schroeder worked principally at Wisconsin Aviation's Watertown location, but sometimes traveled to the Madison location.  (PPFOF ¶¶ 10-11.)  Schroeder's work hours were 8:00 a.m. to 5:00 or 6:00 p.m.  (PPFOF ¶ 10.)  Schroeder hired Myszewski.  (DPFOF ¶ 31.)

Kevin Fenske initially worked for Wisconsin Aviation between 1998 and 2001; he returned to work for Wisconsin Aviation on June 13, 2005, as the Watertown location "shop manager" or "Aircraft Maintenance Manager."  (DPFOF ¶ 26; PPFOF ¶¶ 12-14.)  Fenske's duties included overseeing all maintenance personnel, scheduling technicians to perform maintenance projects on particular aircraft, communicating with customers regarding aircraft maintenance, ensuring hangar cleanliness, advising the Director of Maintenance (Schroeder) of any delays with maintenance projects, and managing paperwork for maintenance projects.  (DPFOF ¶ 27; PPFOF ¶ 16; DPFOF ¶ 17.)  He

3

worked from 8:00 a.m. to 5:00 p.m. (PPFOF ¶ 13.) Fenske did not have any direct authority to hire or fire aircraft mechanics. (DPFOF ¶ 29; Pl.'s Am. Resp. ¶ 29.) Between June 2005 and September 2005 Schroeder was Fenske's immediate supervisor or manager. (DPFOF ¶ 28; PPFOF ¶ 15.)

Craig Stanly worked for Wisconsin Aviation from May 2002 to November 2005. (PPFOF ¶ 18.) Stanly began as a mechanic and later was appointed as second shift supervisor. This made him Myszewski's supervisor. (PPFOF ¶ 19; Def.'s Resp. at 3.) Patrick Harrington began working for Wisconsin Aviation in July 2005, and was Mysezewski's second shift supervisor from that date to September 2005. (PPFOF ¶¶ 20, 21.)

Between January 26, 2004, and September 2005 Kevin Emery was a full-time apprentice mechanic for Wisconsin Aviation. (PPFOF ¶¶ 25-26.) During Myszewski's employment at Wisconsin Aviation, Todd Ripp was a part-time mechanic for Wisconsin Aviation. (PPFOF ¶ 28.)

Jane Seeber was Wisconsin Aviation's Human Resources Manager from 1995 until March 2007. Between January 2004 and September 2005, her office was located at the company's Watertown facility. (PPFOF ¶¶ 29-31.)

Audra Mueller worked for Wisconsin Aviation as a "line technician" at the Watertown facility from January 2005 until May 2007. (PPFOF ¶ 35.) Mueller's responsibilities included fueling planes, washing and cleaning aircraft, pulling aircraft out and preparing aircraft for flight. (PPFOF ¶ 36.) She interacted with Wisconsin Aviation's mechanics on a daily basis during her employment. (PPFOF ¶ 37.)

4

Section 2-1 of the Employee Handbook in place during Myszewski's employment stated:

> Equal Opportunities
> Our organization is an equal opportunity employer, and our corporate policy is to not discriminate against any individual on the basis of race, ethnicity, color, creed, sex, marital status, age, national origin, physical or mental disability, or any other basis prohibited by federal, state, or local law. We are committed to the principle that employment decisions should be based on merit alone, and forbid unlawful discrimination by any Manager, Supervisor, or other employee.

(PPFOF ¶ 133; DPFOF ¶ 14.)

Wisconsin Aviation's written policy regarding work hours read in relevant part: "A normal work week is 40 hours and generally includes an unpaid meal break. Exceptions may be necessary and are at the discretion of the Department Supervisor or Manager." (DPFOF ¶ 15; Pl.'s Am. Resp. ¶ 15.) The company's written attendance policy included the following statement:

> Being at work regularly and on time is a reflection of your attitude about your job. The Company expects you to have acceptable attendance. . . . While an occasional absence or tardiness may occur, a pattern of poor attendance or punctuality may result in disciplinary actions up to and including discharge.

(DPFOF ¶ 16.) Moreover, a policy required employees to complete Absence Approval Forms for any absences from an employee's scheduled work hours. (PPFOF ¶ 61.[2]) Each

---

[2] Wisconsin Aviation objected to Myszewski's proposed findings of fact ¶¶ 47 through 66, but its objection is overruled as improperly made. Civil L.R. 56.2(c) requires the summary judgment movant to respond to the opponent's proposed findings "in accordance with the provisions of subparagraph (b)(1) of this rule." Subparagraph (b)(1) requires that objections "must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." Wisconsin Aviation contends that as to these proposed findings Myszewski

> has inaccurately paraphrased and mischaracterized the deposition testimony of Messrs. Schroeder and Fenske, resulting in distortions of the record and proposed findings which are inaccurate, misleading and taken out of context. Defendant admits only for purposes of this motion the "facts"

5

of these policies was included in the October or November 2003 version of the Wisconsin

Aviation Employee Handbook. (DPFOF ¶ 19; PPFOF ¶ 130.)

The grievance section of the Employee Handbook contained a written policy

concerning the reporting of unlawful discrimination, which stated in relevant part:

"Employees who believe that they have experienced unlawful discrimination should submit

a written complaint to the human resources representative at the time of the action or as

soon as possible thereafter." (DPFOF ¶ 18; Pl.'s Am. Resp. ¶ 18; PPFOF ¶ 136.)

The Employee Handbook described the company's disciplinary policy as

follows:

> We encourage each employee to achieve a successful career with the Company. Should you experience difficulties in performing your job or attendance is unacceptable, your Supervisor or Manager may take the following steps to assist you in improving performance: Verbal Counseling – Your Supervisor or Manager will explain to you how your performance is deficient and outline expectations for future performance; Written Warning – If your performance continues to be unsatisfactory, your supervisor will issue a written warning. Your Supervisor or Manager will again outline expectations for future performance. It is best to have the employee sign it. If satisfactory performance is not achieved after written warning, other disciplinary action up to and including termination of your employment may occur.
>
> Depending on the nature and the severity of the performance problem, any or all of these steps may be eliminated. Exceptions or deviations may be necessary. The

---

set forth in the proposed findings to the extent they actually reflect what Messrs. Schroeder and Fenske testified to at their depositions. However, defendant denies plaintiff's proposed findings to the extent that they mischaracterize and inaccurately paraphrase such testimony.
(Def.'s Resp. at 3-4.)
It is not the court's responsibility to scour the depositions to find where the deposition testimony may differ from the paraphrasing in twenty proposed findings. Wisconsin Aviation needed to include specific citations to specific pages in the depositions that differed from any proposed finding of fact. It did not. Thus, without proper objections, these proposed findings are admitted for purposes of the summary judgment motion.

> Company or an employee can terminate the employment
> relationship at will without following the disciplinary procedures.

(PPFOF ¶ 69.)

The Employee Handbook in place during Myszewski's employment was last revised in November 2003. (PPFOF ¶ 130.) Between January 2004 and September 2005, Wisconsin Avaiation did not issue copies of its Employee Handbook to any employees. Instead, each department was provided a copy. (PPFOF ¶ 127.) Nonetheless, when Myszewski started with Wisconsin Aviation, she was told where the Employee Handbook was located. (DPFOF ¶ 21; PPFOF ¶ 128.)

According to Schroeder, between January 2004 and September 2005, Wisconsin Aviation's mechanics were required to work forty hours per week. (PPFOF ¶ 44.) Fenske and Seeber also believe that most mechanics and full-time employees worked forty weekly hours. (PPFOF ¶¶ 45-46.)

Myszewski's scheduled weekly hours totaled forty-two and one-half hours per week, minus meals and breaks. (*See* PPFOF ¶¶ 158-159.) However, because of complications of pregnancy, between June 22, 2004, and the last week of January 2005, she worked in a light duty, clerical capacity. (PPFOF ¶¶ 165-166.) Following an August 14, 2004, letter from Myszewski's physician advising that she work a thirty-hour weekly schedule due to the pregnancy complications, Wisconsin Aviation reduced Myszewski's weekly hours to thirty. Sometime in or after January 2005, Myszewski resumed a schedule with work hours of 10:30 a.m. to 7:00 p.m. (PPFOF ¶ 167; Def.'s Resp. at 8; Myszewski Decl. Ex. II.)

7

While Myszewski was on a light duty work assignment, Seeber told her that thirty hours of weekly work was considered full-time employment at Wisconsin Aviation. (PPFOF ¶ 168.[3])  Krys Brown, who was employed as Wisconsin Aviation's Human Resources Manager beginning in March 2007, told Mueller (the female line technician) that between thirty and thirty-six hours of weekly work was considered full-time by Wisconsin Aviation.  (PPFOF ¶ 169.)

Shortly after Myszewski started working, Schroeder informed her that her ability to deviate from scheduled work hours was a perk of working for Wisconsin Aviation. Schroeder further advised Myszewski that if her work was complete she could leave prior to the end of her shift.  (PPFOF ¶ 171, ¶ 179.[4])

Between June 2005 and September 2005, a mechanic who expected to deviate from scheduled work hours was to notify Fenske or Schroeder.  If Wisconsin Aviation could accommodate the schedule deviation, it did so.  (PPFOF ¶ 47.) If Schroeder was not preset, Fenske could authorize a mechanic's requested deviation from scheduled hours.  (PPFOF ¶¶ 48, 50.)  And, Fenske does not recall denying an employee's request to leave early between June 2005 and September 2005.  (PPFOF ¶ 49.)

The "shop schedule" was the schedule of arriving aircraft; a calendar of Wisconsin Aviation's weekly tasks; and where Schroeder noted approved absences,

---

[3] Wisconsin Aviation objects to this proposed finding based on lack of foundation, claiming that it relates to Myszewski's understanding rather than to actual evidence of what defendant's definition of full-time really was.  (Def.'s Resp. at 8.)  However, this proposed finding and proposed finding ¶ 169 set forth admissions by Wisconsin Aviation's human resources managers rather than simply Myszewski's understanding.

[4] Wisconsin Aviation objects to these proposed findings based on lack of foundation, relating to Myszewski's understanding rather than to evidence of what defendant's procedures for absences really were.  (Def.'s Resp. at 8.)  However, these proposed findings set forth an admission by Wisconsin Aviation's supervisory employee rather than simply Myszewski's understanding of a policy.

tracked mechanics' work hours, and documented tardy arrivals and early departures by employees.  (PPFOF ¶ 63.)

Before Fenske started in June 2005, Myszewski gave notice of absences to her then-supervisor or Schroeder, depending on which of the two individuals was present. After Fenske started, Myszewski would attempt to notify Fenske of her schedule deviation. If none of the aforementioned individuals was available, Myszewski notified Stanly. (PPFOF ¶ 175.[5])

Absence Approval Forms hung on the time clock and were to be used when a mechanic requested a day off or less than a day off.  (PPFOF ¶¶ 55-56, 59.)  The forms were not required if an employee was to arrive late for work or leave early; in that situation the employee could fill out the form or simply ask Schroeder for permission.  (PPFOF ¶¶ 58, 60.)  Wisconsin Aviation did not follow its policy with regard to Absence Approval Forms.  (PPFOF ¶ 62.)  However, Schroeder suggested to Myszewski that she use the form and she did so on at least nine occasions.  (PPFOF ¶¶ 180-181.[6])

If a mechanic deviated from his or her scheduled hours and missed hours, Wisconsin Aviation permitted the mechanic to make up the hours.  (PPFOF ¶ 65.) However, mechanics could not make up hours at their discretion; they needed to secure Wisconsin Aviation's prior approval.  (PPFOF ¶ 66.)

---

[5]Wisconsin Aviation objects to this proposed finding of fact as being based on Myszewski's understanding.  (Def.'s Resp. at 8.)  However, these are actions Myszewski took rather than her mere understanding.

[6]Wisconsin Aviation objects to these proposed findings as irrelevant and lacking foundation, but the court overrules the objection.

9

Schroeder's policy for employee discipline was to provide an employee with two verbal warnings before a written warning. (PPFOF ¶ 67.) He reprimanded individuals for attendance violations verbally before utilizing additional forms of discipline. (PPFOF ¶ 72.)

Between January 2004 and September 2005, Wisconsin Aviation did not have a policy or form for memorializing employee discipline. (PPFOF ¶ 73.) However, Schroeder's personal policy was to make a note of the discipline and to place the note in the employee file Schroeder maintained in his office. (PPFOF ¶ 75.) Schroeder documented the verbal discipline in the employee's personnel file as soon as possible. (PPFOF ¶ 81.)

Fenske could not hire or terminate mechanics. (PPFOF ¶ 116.) However, if he reported employee misconduct to Schroeder, he expected that Schroeder would discipline the employee. In Fenske's experience, Schroeder accepted his word regarding verbal employee discipline and did not investigate his report. (PPFOF ¶ 92.[7]) However, between January 2004 and September 2005, Schroeder investigated all reports of employee misconduct by gathering facts before issuing discipline. (PPFOF ¶ 94.)

---

[7]Wisconsin Aviation objected to Myszewski's proposed findings of fact 78 through 112, but except as to relevance its objection is overruled as improperly made. Again, Wisconsin Aviation objects on the basis that Myszewski "has inaccurately paraphrased and mischaracterized deposition testimony." (Def.'s Resp. at 4.) Again, Wisconsin Aviation admits the proposed findings to the extent they reflect what the individuals testified but "denies plaintiff's proposed findings to the extent that they mischaracterize and inaccurately paraphrase such testimony." (Def.'s Resp. at 4-5.) However, again, Wisconsin Aviation needed to include specific citations to specific pages in the depositions that differed from each specific proposed finding of fact and it did not. Therefore, without a proper objection the proposed findings are deemed admitted.

To the extent that Wisconsin Aviation objects based on relevance, if the proposed finding is included in this decision, the court has deemed it at least marginally relevant.

Schroeder says he verbally disciplined employees who habitually arrived late to work.  (PPFOF ¶ 100.)  He considered habitually late to be late to work once a month for three months or late to work three times in one week.  (PPFOF ¶¶ 103-104.)  If an employee arrived late to work, whether Schroeder issued verbal discipline depended on the employee's excuse for the tardy arrival.  (PPFOF ¶ 110.)  If the employee remarked that he didn't care if he came in late, verbal discipline was warranted, but Schroeder would not issue verbal discipline if the employee arrived late because the employee's child was sick and the employee had to find another means of day care.  (PPFOF ¶¶ 111-112.)

If a mechanic left work early without notification on one occasion, Schroeder did not discipline the mechanic, but if the mechanic left work early twice without notification, Schroeder asked the mechanic about the unapproved departures.  (PPFOF ¶ 105.)  If Schroeder told the mechanic that the problem needed to be corrected, he considered that conversation to be verbal discipline.  (PPFOF ¶ 107.) According to Schroeder, a mechanic who worked less than forty hours on three occasions in a twelve-week period without a valid reason had unacceptable attendance.  (PPFOF ¶ 109.)

Between January 2004 and September 2005, Seeber kept Wisconsin Aviation's employee personnel files in her office.  (PPFOF ¶ 120.) Schroeder kept written warnings to employees in his office file, but did not tell anyone that he maintained these separate files.  (PPFOF ¶¶ 115, 121.[8])  Schroeder transferred information from his files to the human resources personnel file upon an employee's termination.  (PPFOF ¶ 125.) Even though he did not place written warnings into the human resources employee

---

[8]Wisconsin Aviation objects to these proposed findings of fact, again based on supposed inaccurate paraphrasing or mischaracterization but without any citation to specific pages of Schroeder's deposition transcript.  The objection is overruled for the same reasons as set forth in the above footnotes.

personnel files, it was his habit to inform Seeber and Baum of written warnings.  (PPFOF ¶ 115.)

No one had to approve Schroeder's decision to terminate an employee.  (PPFOF ¶ 117.)  However, his termination procedure included advising Seeber and Baum that he was going to terminate an employee.  (PPFOF ¶ 118.)

During her period of employment with defendant, but excluding her period of light duty, Myszewski deviated from her schedule 44.8% of the days she worked.  (PPFOF ¶ 184.[9])  After June 2005 and until her last full week of employment, Myszewski's average weekly hours were 37.2.  (PPFOF ¶ 186.)  She worked less than forty hours in eight of the weeks between June 1 and September 14, 2005.  (PPFOF ¶ 187.)

Myszewski's performance review of April 30, 2004, three and a half months after she started at Wisconsin Aviation, indicated that her attendance was rated as "meets expectations."  She had worked less than forty weekly hours in six of sixteen weeks prior to that review, and averaged less than forty hours per week.  (PPFOF ¶¶ 198-199.[10])

Wisconsin Aviation did not discipline Myszewski in writing for attendance (or any other) issues before Fenske was hired.  (PPFOF ¶ 208; Def.'s Resp. at 10.)  However, in an undated document referring to the week of June 27, 2005, Schroeder wrote that he and Fenske verbally warned Myszewski about "leaving prior to the end of her shift, taking off without notification and or prior approval, and missing days without approval or

_____

[9]Defendant objects on the basis of relevance because Myszewski's attendance when she was first employed was not at issue and the time period considered to be unsatisfactory by Wisconsin Aviation was January to September 2005, but it does not dispute the actual calculation.

[10]Wisconsin Aviation disputes the relevance of Myszewski's attendance record prior to April 30, 2004, and the performance review to defendant's employment expectations over a year later when it terminated Myszewski.  However, it does not dispute the statistics or what the performance review stated.  The court finds the review and prior attendance relevant.

12

notification." (PPFOF ¶ 214; Myszewski Decl. Ex. S.) A document dated August 1, 2005, and signed by Schroeder reads: "Sarah was given a second verbal warning for leaving early on the 7/27 & 7/29 [sic] before the end of her shift without notification or approval. She failed to inform me she had left early the following day. I discovered this when reviewing her time card." (PPFOF ¶ 226; Myszewski Decl. Ex. Q.[11]) Seeber did not see these documents memorializing verbal warnings until after Myszewski was terminated. (PPFOF ¶ 232.[12]) And, the documents were placed in Myszewski's personnel file after her termination. (PPFOF ¶ 234.)

Myszewski swears that she did not receive the verbal warnings described in Schroeder's August 1, 2005, notes. (PPFOF ¶¶ 237, 255; Myszewski Decl., Ex. A. at 133, 138, 158.[13])

Moreover, on August 1, 2005, Myszewski informed Fenske or Schroeder that she would arrive late for work on August 2, 2005, due to family dental appointments. (PPFOF ¶ 239.[14]) At 11:30 a.m., on August 2, 2005, Myszewski called Wisconsin Aviation

[11]Wisconsin Aviation objects to proposed findings 209-234 as inaccurately paraphrasing and mischaracterizing the deposition testimony of Schroeder and Fenske. (Def.'s Resp. at 11.) However, proposed findings 214 and 226 are based on the documents found at Exhibits S and Q to Myszewski's declaration, not deposition testimony. Therefore, the objection is overruled as to these findings.

[12]Wisconsin Aviation objects to proposed findings 209-234 as inaccurately paraphrasing and mischaracterizing the deposition testimony of Schroeder and Fenske. (Def.'s Resp. at 11.) However, proposed findings 232 and 234 are based on the deposition testimony of Seeber, not Schroeder or Fenske. Moreover, the proposed finding accurately reflects the deposition testimony on this point. (Seeber Dep. (attached to Doc. 74) at 81-82.) Therefore, the objection is overruled as to these findings.

[13]Wisconsin Aviation objects to proposed finding 237 on the basis that Myszewski's denial at deposition is not credible. Credibility determinations are for the jury at trial, not the judge at the summary judgment stage. Wisconsin Aviation objects to proposed finding 255 on the basis that it is inconsistent with the proposed facts relating what Schroeder, Fenske and the documentation say. That facts are inconsistent means that summary judgment may be inappropriate, not that the proposed fact is objectionable.

[14]Again, Wisconsin Aviation objects to proposed findings 239-244 claiming that Myszewski has inaccurately paraphrased and mischaracterized deposition testimony. (Def.'s Resp. at 11-12.) However, Wisconsin Aviation failed to specify the differences between the proposed findings and the deposition testimony.

13

and left a message for Fenske that she would be in later or possibly not in at all because her son was not well after his dentist appointment and she asked that Fenske return her call.  (PPFOF ¶ 240.)  Myszewski called Fenske again at 3:00 p.m. and asked whether he wanted her to come into work; Fenske informed her it was not necessary.  (PPFOF ¶ 243.) Subsequently, Fenske advised Schroeder that Myszewski would not be in that day. (PPFOF ¶ 244.)

On August 3, 2005, Schroeder called Myszewski into his office and presented her with a memo titled "RE:  Performance Evaluation," which was a written warning. (PPFOF ¶¶ 246-247; DPFOF ¶ 52.)  The written warning stated, in part, as follows:

> This review is a written warning of a discrepancy in your attendance.  You have been given verbal warnings on two separate dates.  These warnings explained that unexcused absents [sic] would not be allowed.  I have in the past allowed you time off to attend to personal issues with the understanding that all time off requires my approval, and your request would need to be made in a timely manner.  You have been warned that you have not given me notice in a timely manner or have taken off with out [sic] prior approval.
> You are schedule [sic] to be at work at 10:30 am to 7:00 pm Monday thru Friday.  You have two schedule [sic] 15-minute breaks, one at 12:30 pm and one at 5:00 pm, and a 30-minute lunch from 2:30 pm to 3:00 pm.
> All requests for time off will require a one-week advance notification and approval.
> If you cannot be present at work during this schedule, your position with Wisconsin Aviation will be reevaluated.

(PPFOF ¶¶ 247, 252, 256, 261; DPFOF ¶ 53; Schroeder Dep. (attached to Doc. 74) Ex. 17.)  Schroeder told Myszewski that the warning was based on something Fenske had told him.  (PPFOF ¶ 248.[15])

———————————————

[15]Wisconsin Aviation objects based on inaccurate paraphrasing, but the court has checked the proposed finding against the deposition testimony and finds it accurate.

After reading the portion of the memo referring to break and lunch schedules, Myszewski asked Schroeder whether he required everyone to work that set schedule, and Schroeder responded: "It's not your concern how I deal with the other guys." (PPFOF ¶ 262.)

Myszewski signed and dated the written warning, acknowledging that she had read it and understood its contents. (DPFOF ¶ 54; Schroeder Dep. Ex. 17.) She did not contact human resources after receiving this warning to complain that she was being treated differently because of her gender. (DPFOF ¶ 55.) Myszewski says she did not complain because she believed that as a female mechanic in the aircraft industry she had to tolerate certain objectionable conduct in the workplace. (PPFOF ¶ 266.[16])

Prior to August 3, 2005, Myszewski and Schroeder had an agreement that she could clock out at 3:00 p.m. to pick her children up from day care when necessary. When Schroeder met with Myszewski about the written warning, she asked Schroeder whether the written warning vitiated that agreement. He said it did not. (PPFOF ¶ 528.[17]) Also, Schroeder told Myszewski that the break and lunch schedule described in the written discipline was not efficient, and he adjusted the lunchtime. (PPFOF ¶ 529.)

On some date prior to September 6, 2005, Myszewski asked for approval and received Schroeder's permission to leave one to two hours early on September 6 and

---

[16]Wisconsin Aviation objects to this proposed finding as argumentative. The court has disregarded the argumentative portion.

[17]Wisconsin Aviation obejcts to proposed findings 528 and 529 as irrelevant because subsequent modifications to the warning as to day care or break and lunch schedule were not at issue for the attendance event immediately preceding her termination. The court overrules the objection.

15

September 14 to attend her sons' school orientations. (PPFOF ¶ 267;[18] Myszewski Decl. Ex. A at 142-43.) As Myszewski left work early to attend one son's orientation on September 6, 2005, she reminded Schroeder that she needed to leave work early on September 14 to attend her other son's orientation. In response, Schroeder said: "Yeah, yeah, okay." (PPFOF ¶ 268; Myszewski Decl. Ex. A at 143.)

On September 14, 2005, just before 5:00 p.m., Myszewski told Fenske that she needed to leave work early to attend her son's orientation. (PPFOF ¶¶ 279, 301.) She said she would make up her missed hours by working late on September 15 and September 16; Fenske agreed to allow her to do so. (PPFOF ¶ 285; see PPFOF ¶¶ 291, 292.) Myszewski did not tell Fenske that Schroeder had already approved her early departure. (PPFOF ¶ 280.)

Myszewski left work at 5:00 p.m., approximately two hours prior to the end of her scheduled shift, on September 14, 2005. (DPFOF ¶ 60.) Sometime after she left, Fenske informed Schroeder that Myszewski said she had to leave early, that Fenske gave her options for making up her time and Myszewski responded with "I got to go" or "I don't care, I have to leave." (PPFOF ¶¶ 304, 305.) Fenske advised Schroeder that he denied Myszewski permission to make up her hours at the times she suggested. (PPFOF ¶ 296.)

Wisconsin Aviation's shop schedule for September 14, 2005, contains the following notation: "Sarah Off 5:00." (PPFOF ¶ 271.)

_____

[18]Again, Wisconsin Aviation objects to proposed findings 267-277 and 280-311 in one objection based on alleged inaccurate paraphrasing and mischaracterization of deposition testimony, without specifically pointing out what the inaccuracies are. For the same reasons as set forth above, such a general objection is overruled. To the extent that the court has included the proposed findings, the additional objection of irrelevance is overruled as well.

16

Myszewski's employment was terminated by Schroeder at about 10:30 a.m. on September 15, 2005. (DPFOF ¶ 61; *see* DPFOF ¶ 62; Pl.'s Am. Resp. ¶ 62.) At that time, Schroeder called Myszewski into his office and told her that Fenske told him she had left work early and without permission the previous evening. (PPFOF ¶ 315.) Schroeder has said he terminated Myszewski because she told Fenske on September 14 that she needed to attend her son's orientation and she had received verbal and written warnings about adhering to the work schedule. (PPFOF ¶¶ 316, 317.) During the meeting Myszewski did not tell Schroeder that she had previously notified him that she could not work her scheduled hours on September 14, 2005. (DPFOF ¶ 66.) She was too upset by the termination to remind him that he had previously approved her request to leave early on September 14. (PPFOF ¶ 319.)

Fenske did not specifically tell Schroeder to terminate Myszewski's employment. (DPFOF ¶ 64; Pl.'s Am. Resp. ¶ 64.) According to Schroeder, what was said between Fenske and Myszewski on September 14 did not factor into his decision to terminate Myszewski. (PPFOF ¶ 307.)

Schroeder claims that he spoke with Baum (Wisconsin Aviation's president) and Seeber (human resources manager) prior to terminating Myszewski, explaining what had happened in the past regarding attendance and warnings, and neither Baum nor Seeber objected to his decision. (PPFOF ¶ 313.) However, Seeber says no one informed her that Wisconsin Aviation was going to terminate Myszewski; she did not know about Myszewski's termination until after it occurred. (PPFOF ¶ 314.[19])

---

[19]Wisconsin Aviation objects to this proposed finding as irrelevant. However, Seeber's testimony that she was not informed draws into question Schroeder's credibility, which *is* relevant for present purposes.

According to Schroeder, even if he knew Myszewski asked to make up hours at a later date and Fenske approved her request to leave and make up hours, Schroeder would have terminated Myszewski's employment because she failed to provide him with one week's notice. (PPFOF ¶ 323.) Schroeder maintains he terminated Myszewski's employment because she demonstrated "habitual problems of attendance." (PPFOF ¶ 324; Schroeder Dep. (attached to Doc. 74) at 147.)

Following Myszewski's termination, Schroeder asked Fenske to memorialize Fenske's September 14 conversation with Myszewski, in which she informed him of her need to leave early. (PPFOF ¶ 306.) Fenske wrote an e-mail to Schroeder and Seeber stating:

> Pete,
> The following occurred 9/14/05:
> Sarah approached me about 4:55 and told me she had to leave at 5:00, something about registering her kids for something, not sure what?. I had given her three optins [sic] to make up her time. Come in early thursday, come in early friday, or work saterday [sic] morning. She said she could not do any of the following. She did say she could stay late, but that was not an option due to her not being efficient when we are gone for the night. I did not tell her this as it was not an option. She did however state that she was leaving anyways, because she did't [sic] care.

(PPFOF ¶ 308; Myszewski Decl. Ex. W.)

Wisconsin Aviation stated in its September 22, 2005, correspondence to the "Wisconsin Unemployment Office":

> As you requested, below is the reason for Sarah's discharge on 9/15/05, including the incidents and warnings that led to this decision:
> . . . .
> • . . . Sarah was given a written warning on 8/3/05 about her continued poor attendance, including warnings

18

> about her lack of timely notice for requested time off
> and for absences without approval. This written
> warning set a requirement of a one-week's notification
> for all future time-off requests and also set a
> break/lunch schedule that she was to follow . . . .
> • Sarah, failed, on several occasions, to adhere to the
>   break/lunch schedule that was set forth in her written
>   warning.
> • On 9/14/05, Sarah left early at 5:00 p.m. She
>   approached her supervisor at 4:55 p.m. and said she
>   had to leave early at 5:00 p.m. to take care of a
>   personal matter she had forgotten about. No prior
>   approval was given for this absence. She was offered
>   an opportunity to make up the lost time by coming in
>   early on 9/15/05 and/or 9/16/05 and/or working the
>   morning of 9/17/05, but she was either not able to or not
>   willing to do so.
> • Sarah was, therefore, discharged for poor attendance
>   on 9/15/05.

(PPFOF ¶ 325; Myszewski Decl. Ex. T.) Schroeder assisted Seeber in writing this letter.

(PPFOF ¶ 530.[20])

Wisconsin Aviaiton is not aware of any instances when Myszewski failed to

follow the break and lunch schedule prescribed in the August 3 written warning. (PPFOF

¶¶ 534-535, 537-538.[21])

Other than Myszewski, Schroeder has not terminated any mechanics for poor

attendance. (PPFOF ¶ 340.)

Wisconsin Aviation applies the same attendance requirements to full-time

and part-time employees, all of whom must arrive and depart at scheduled times each day.

---

[20]Wisconsin Aviation objects to this proposed finding, but the explanation for the objection is not on point for the contents of this proposed finding. Further, the court finds the fact to be relevant.

[21]Wisconsin Aviation objects to these proposed findings as irrelevant. The objection is overruled.

(PPFOF ¶ 341.[22]) However, part-timer Ripp did not have a set start time; because of other employment, Ripp's start time was between 3:00 and 3:30 p.m. each day, whenever he arrived from his other job. (PPFOF ¶¶ 343, 345, 347, 348.) The end of his shift changed "on the shift." (PPFOF ¶ 344.) Schroeder and Ripp agreed that if Ripp was going to be late for work or unable to make it, he "would call" and that if Ripp could provide Schroeder with notice for time off, he would do so. (PPFOF ¶ 352.) Between January 2004 and September 2005, if Ripp needed to leave work early, sometimes he would advise Wisconsin Aviation of his need to leave and other times he would ask if he could leave. (PPFOF ¶ 351.) However, Ripp was never disciplined for leaving early after providing Stanly with notice. (PPFOF ¶ 357.)

Stanly worked four days a week with scheduled hours of 10:30 a.m. to 9:00 p.m. (PPFOF ¶ 365.) However, there were times when he worked from 10:30 a.m. to 7:00 p.m. or from 12:30 p.m. to 9:00 p.m. (PPFOF ¶¶ 366, 367.) At one point when Stanly inquired about working part-time hours, Baum stated that "30, 32, 35 hours is still considered full time." (PPFOF ¶ 369.)

When hiring Stanly, Schroeder said "[w]e're very flexible here at Wisconsin Aviation." (PPFOF ¶ 373.) Employees could come and go as they pleased provided they got their hours in and finished their work. (PPFOF ¶ 371.) If Stanly had an appointment or could not get to work on time, he did not come in on time and let Schroeder or his supervisor know when he arrived, or he worked late. (PPFOF ¶¶ 372, 382.) If Stanly needed time off, he notified Schroeder or Fenske. (PPFOF ¶ 374.) Also, Wisconsin

---

[22]Wisconsin Aviation objected to proposed findings 338 to 474 based on relevance. To the extent the court has included any of these proposed findings, it has determined that the facts are relevant and overruled the objection.

20

Aviation did not require Stanly to obtain prior approval to make up hours and did not specify when he had to make up hours. (PPFOF ¶ 390.) When Stanly arrived late to work without notifying anyone first, he was not disciplined and his personnel file does not contain any warnings for attendance violations. (PPFOF ¶¶ 391, 402.)

In Stanly's experience, Wisconsin Aviation was very accommodating toward employees who had a last minute need to leave work. (PPFOF ¶ 379, *see* PPFOF ¶ 381.) Stanly worked less than forty weekly hours eighteen times during the period that he and Myszewski worked for Wisconsin Aviation. (PPFOF ¶ 383.) He arrived within a half-hour of his scheduled start time only 27.2% of the days he worked during Myszewski's employment with Wisconsin Aviation. (PPFOF ¶ 385.) On one time card from July 27, 2005, Stanly's hours of work varied between 10:30 a.m. to 7:00 p.m., 5:50 a.m. to 7:30 p.m., 6:10 a.m. to 7:30 p.m., 6:00 a.m. to 3:10 p.m., 6:00 a.m. to 7:00 p.m., and 5:45 a.m. until 3:35 p.m. (PPFOF ¶ 386.) Fenske did not ask Schroeder to discipline Stanly for these schedule deviations because Fenske assumed Stanly must have had something worked out. (PPFOF ¶ 389.)

If McGuire knew a scheduling conflict would cause him to miss less than a full day of work, there were times he did not secure prior approval. (PPFOF ¶ 407.) Between July 2004 and September 2005, McGuire believed that he was to report his delinquent arrival to his immediate supervisor, and if he had to leave work early, he understood that he had to talk to his supervisor. (PPFOF ¶¶ 408, 409.) When he had a last-minute need to change his schedule, McGuire "just [went] to the supervisor and state[d] that, you know, hey, I've got this going on, I need to leave." (PPFOF ¶ 410; McGuire Dep. (attached to Doc. 74) at 32.)

21

McGuire was a lead technician, but was required to follow the same attendance requirements as other mechanics. (PPFOF ¶ 416.) Frequently, he arrived late to work between July 2004 and September 2005 because he had to attend to his children and get them to day care each morning. (PPFOF ¶ 417.) McGuire did not secure prior approval for these tardy arrivals. (PPFOF ¶ 418.) Occasionally, between July 2004 and September 2005, McGuire gave Wisconsin Aviation notice of his need to take off work that day. (PPFOF ¶ 419.) Twice a week for a period of six months in summer and fall 2004, McGuire had chiropractic appointments that caused him to arrive late for work. (PPFOF ¶ 420.) After approximately two months of these appointments, Schroeder told McGuire that he needed a little more advance notice of when McGuire would be gone. (PPFOF ¶ 422.) During Myszewski's employment at Wisconsin Aviation, McGuire arrived late to work 255 of the 296 days he worked, and he worked less than forty hours a week on nine occasions. (PPFOF ¶¶g 422, 424.) According to Schroeder and Wisconsin Aviation's discovery responses, Wisconsin Aviation and McGuire negotiated an agreement allowing McGuire to arrive periodically after his 8:00 a.m. scheduled start time. (PPFOF ¶¶ 426, 427, 429.) However, McGuire does not recall any special agreement that allowed him to frequently arrive late to work. (PPFOF ¶¶ 430, 431.)

McGuire completed Absence Approval Forms if he expected to be absent from work for an entire day or more for vacation or unpaid time off. (PPFOF ¶ 434.) However, if he learned of a scheduling conflict that would cause him to miss a portion of that same day, he did not compete an Absence Approval Form. (PPFOF ¶ 435.)

McGuire was never disciplined for last-minute absences or his frequent tardy arrivals. (PPFOF ¶¶ 440, 442.) His personnel file does not contain any disciplinary notices

for deficient attendance nor any note regarding conversations he may have had with Schroeder concerning his chiropractic appointments. (PPFOF ¶¶ 439, 441.)

During Harrington's employment—he began working as Myszewski's supervisor in July 2005—he was scheduled to work until 6:00 p.m. However, he arrived early for work Monday through Thursday so he could leave early on Friday. (PPFOF ¶¶ 20-21, 447.) Harrington did not have a special arrangement with Wisconsin Aviation that allowed him to work such a schedule. (PPFOF ¶ 448.)

Between January 2004 and September 2005, Emery's scheduled work hours were 8:00 a.m. until 4:30 p.m. (PPFOF ¶ 450.) Between January 1, 2004, and September 15, 2005, he worked less than forty weekly hours on nineteen occasions, eight of those were between June 1 and September 14, 2005, during which time he averaged 37.8 hours of work per week. (PPFOF ¶¶ 456-458.)

Emery had family obligations, and Wisconsin Aviation was flexible and allowed him to leave early and permitted him to make up time, without any special scheduling arrangement. (PPFOF ¶¶ 459, 460.) Emery never had a request to leave early denied. (PPFOF ¶ 462.) On two occasions between January 2004 and September 2005, he left work prior to the end of his scheduled work hours without letting a supervisor know he was doing so. (PPFOF ¶ 463.) However, Schroeder verbally disciplined him for the second early, unapproved departure. (PPFOF ¶¶ 464, 465.) Although Emery arrived late for work on July 25, 27, 28, and 29, 2005, Fenske did not recommend that Schroeder discipline him for these tardy arrivals. (PPFOF ¶¶ 466, 470.) The shop calendar does not indicate that these tardy arrivals were preapproved. (PPFOF ¶ 471.)

23

The hours and attendance records of mechanic Ben Pitterle from the pay period beginning January 3, 2005, to the pay period ending September 11, 2005, totaling thirty-six work weeks, show that Pitterle worked an average of 45.5 hours per week and worked at least thirty-four forty-hour weeks. (DPFOF ¶ 40.) During the same time period mechanic Doug Siebel averaged 44.8 hours per week, and worked thirty-six forty-hour weeks. (DPFOF ¶ 41.) During this time frame mechanic Steve Veum averaged 42.1 hours per week, and worked thirty-five forty-hour weeks. (DPFOF ¶ 43.) The hours and attendance record of John Weigand during this period show that he averaged 44.7 hours per week and worked thirty-six forty-hour weeks. (DPFOF ¶ 44.) Mechanic Scott Yeager averaged 43.5 hours per week and worked thirty-five forty-hour weeks during that time. (DPFOF ¶ 45.)

Of the eight full-time mechanics, Myszewski ranked last in terms of hours worked during the period from January 3, 2005, to September 11, 2005; the seven other full-time mechanics worked at least 210 more hours than Myszewski, and five worked at least 300 hours more than Myszewski. Myszewski worked only eleven forty-hour work weeks during this time period. However, this time period includes at least a few weeks in January 2005 when Myszewski was on light duty. (DPFOF ¶¶ 46-48, 51; Pl.'s Am. Resp. ¶¶ 46-48, 51.)

A couple weeks prior to Myszewski's dismissal, Fenske made the following comment to several mechanics, including Ripp: "No girl's working on my plane." (DPFOF ¶ 70; PPFOF ¶ 500.) Fenske also commented to mechanic Stanly in August or September 2005: "No woman will ever work on one of my planes." (DPFOF ¶ 71; PPFOF ¶ 493.) Around the end of July 2005, Fenske and Harrington were together in an aircraft, pulling

24

it into a hanger.  Myszewski was outside the aircraft and visible.  Fenske looked at Myszewski and said:  "[W]ell, there's a big waste of money."  Harrington asked Fenske what he meant, and Fenske replied:  "There's no place in aviation for women, no woman will ever work on my planes. . . . [T]his is no place for a woman."  (DPFOF ¶ 72; PPFOF ¶ 492.)  According to McGuire, "[i]t was very well observed throughout the shop that for whatever reason, [Fenske] didn't feel that [Myszewski] needed to be there."  (PPFOF ¶¶ 498, 499; McGuire Dep. (attached to Doc. 74) at 72.)

No employees notified Schroeder that Fenske had made such comments and Seeber never received a complaint about Fenske.  (DPFOF ¶ 73; PPFOF ¶¶ 505, 508.)

Audra Mueller was the only female line technician.  (PPFOF ¶ 475.[23])  Fenske told Mueller he could not believe Wisconsin Aviation had hired a woman as a line technician.  (PPFOF ¶ 481.)  Fenske made the following comments to her when she was working at the fuel pumps:  "[F]uckin' women should be home barefoot and pregnant."  (DPFOF ¶ 74.)  According to Mueller, Fenske made other comments:

> [T]he whole time he was there while I was there too, it was they shouldn't hire a woman line tech, you know, there is so much stuff he said to me about being a woman and working, you know, all the time, just all the time, all the time.
> Q      Did he say to you that they shouldn't have hired a woman line tech?
> A      Oh, yeah, oh, definitely. . . . [C]an't believe they hired a woman line tech, can't do the job.  And I did the job better than any man did.  But it was so often and so frequently, all the time.  It was all the time.  He was so bad.  He was bad.

---

[23]Wisconsin Aviation objects to proposed findings 475 to 483, and 489 to 510 as irrelevant. To the extent the court has included any of those proposed findings, it has found them relevant and overruled the objection.

(DPFOF ¶ 75; Tiltman Decl. Ex. 7 at 98-99.) When Mueller had parked a plane in front of a maintenance door, with permission, Fenske "said something about it's worse than tits on a woman, and there is something, there is like something in front of it that he said. . . . [A] woman shouldn't be working here, a woman should be barefoot and pregnant, just about—oh, the saying was you're as worthless as two tits on a boar." (DPFOF ¶ 76; Tiltman Decl. Ex. 7 at 111-12.)

Myszewski was called "blondie" or "girlie" twice by Schroeder and once by Fenske. (DPFOF ¶ 77.) Schroeder never made such comments before Fenske was hired. (PPFOF ¶ 484.) When addressing Myszewski after Fenske began working, Schroeder once said "hey Girly, come to my office." (*Id.*) Myszewski never reported such alleged comments to human resources or anyone else in management. (DPFOF ¶ 79.)

Fenske watched over Myszewski's shoulder and monitored her more than other employees. (PPFOF ¶¶ 489, 490.) Ripp observed that Fenske placed a heavier load on Myszewski than on the male mechanics. (PPFOF ¶ 491.)

Wisconsin Aviation did not employ any female mechanics prior to Myszewski's termination and no females have been employed as mechanics since. (PPFOF ¶ 511.)

When Jennifer Serrano, the human resources manager after Seeber, met with Baum in August 2006 and discussed Wisconsin Aviation's compliance with legal requirements pertaining to discriminatory employment practices, discriminatory language, sexual harassment, wage and hour practices and safety violations, Baum explained that compliance with employment laws was not important to him and that he did not want Serrano to spend her time correcting these issues immediately because he had avoided

26

any ramifications thus far. Baum said he wanted to spend his money on things that were profitable and that human resource functions are overhead. (PPFOF ¶ 525.[24])

Myszewski filed an administrative charge of discrimination against Wisconsin Aviation with the Wisconsin Department of Workforce Development, Equal Rights Division ("ERD") on January 18, 2006. Her initial ERD charge included a claim of sex discrimination. (DPFOF ¶ 7.) On May 17, 2007, the U.S. Equal Employment Opportunity Commission issued a Right to Sue letter. (DPFOF ¶ 10.)

DISCUSSION

Title VII forbids workplace discrimination against an employee regarding "compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may show discrimination in the workplace either through direct evidence of discrimination or through the indirect, "burden-shifting method" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 831-33 (7th Cir. 2005).

A.      Direct Method

To prove discrimination with direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus" or establishment of "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision-maker." *Id.* at 832 (internal quotation marks omitted). However, such a mosaic of circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Id.* (internal quotation marks omitted).

_____

[24]Wisconsin Aviation objects to this proposed finding as lacking foundation, hearsay and/or irrelevant. As statements of a party opponent Baum's statements are not hearsay. The court sees no lack of foundation and finds that the statements are relevant.

27

In similar cases, the Seventh Circuit has recognized as circumstantial evidence: "(1) ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent and (2) evidence of systemically better treatment of employees outside the protected class." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009).

If Fenske had made the decision to terminate Myszewski, Myszewski would breeze through to trial on direct evidence or a circumstantial mosaic of evidence. Mechanic/technician McGuire observed that Fenske did not think Myszewski needed to be at Wisconsin Aviation. The record is replete with comments by Fenske in the two or three months before Myszewski's termination, aimed at Myszewski and indicating that she did not belong at Wisconsin Aviation as an aircraft mechanic. Fenske commented that women in general, and Myszewski and Mueller in particular, did not belong in the aircraft hangar, were useless, belonged at home, etc. That such comments were made in the workplace is highly problematic for Wisconsin Aviation.

However, Schroeder, not Fenske, terminated Myszewski. The evidence that Schroeder's actions were based on Myszewski's gender is weaker. Schroeder hired Myszewski, thereby providing an inference that he would not have discriminated against her when deciding to fire her. *See Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 724 (7th Cir. 2008); *Filar v. Bd. of Educ.*, 526 F.3d 1054, 1065 n.4 (7th Cir. 2008). Generally, these inferences may be drawn by juries at trial and are inconsequential at the summary judgment stage. *See Petts*, 534 F.3d at 724-25; *Filar*, 526 F.3d at 1065 n.4. Further, such an inference dissipates with evidence that the decisionmaker developed a change in attitude in the time span between hiring and firing. *Filar*, 526 F.3d at 1065 n.4. Here,

28

Schroeder's actions toward Myszewski appear to have changed after Fenske was hired, as suggested by Schroeder's use of the terms "blondie" and "girlie" when addressing Myszewski, and Fenske's similar use of such terms.

Moreover, Myszewski relies on the "cat's paw" theory of liability, i.e., when improper intent of a subordinate is imputed to an employer if the subordinate exerts significant influence over the employment decision, as may be demonstrated by the decisionmaker merely rubber-stamping a biased subordinate's recommendation. *Long v. Teachers' Ret. Sys.*, 585 F.3d 344, 350 (7th Cir. 2009).

Wisconsin Aviation did not discipline Myszewski for attendance issues before Fenske's arrival. And, Schroeder's actions toward Myszewski appear to have changed after Fenske was hired, suggesting Fenske influenced Schroeder's actions. Schroeder's acknowledgement that Myszewski's written warning was based on information provided to him by Fenske is confirmation. Moreover, Schroeder fired Myszewski immediately following Fenske's untrue report about Myszewski not caring to make up her hours and leaving anyway and that Fenske had denied Myszewski's request to make up the work, even though he previously informed her that he was granting her request to make up hours on September 15 and 16.

Wisconsin Aviation argues that Schroeder would have made the same decision regardless of Fenske's influence. For instance, it notes that Schroeder says that he would have terminated Myszewski for not providing him with one-week's notice of her need to leave early even if he knew Fenske had approved her request to make up these hours. (PPFOF ¶ 323.) However, the record shows no investigation by Schroeder into Myszewski's use of leave on September 14 such that he would have made an independent

29

decision to terminate her employment. It seems to the court that an investigation would have turned up the note on the shop calendar, indicating that Myszewski was leaving at 5:00 p.m. that day, or perhaps have triggered Schroeder's memory that some time prior to September 6 Myszewski had asked for and had been advised that she had permission to leave early on September 14. Further, Fenske's testimony indicates that if he recommended discipline, Schroeder accepted his word and did not further investigate. (*See* PPFOF ¶ 92.) Hence, there is sufficient evidence to attribute any improper intent on the part of Fenske to Schroeder under the cat's paw theory. Thus, the plaintiff may proceed on her claim using the direct method of proof.

B.     Indirect Method

Moreover, Myszewski gets to trial using the indirect method, which requires that a plaintiff first establish a prima facie case of discrimination, "demonstrating that (1) she is a member of a protected class; (2) her performance met her employer's legitimate expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably," *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007).

If the plaintiff establishes her prima facie case, the burden of production shifts to the employer to show a legitimate, nondiscriminatory reason for its employment action. *Id.* If the defendant meets that burden, the plaintiff may rebut that evidence by showing that the defendant's reasons are pretextual. *Id.* The "'pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate.'" *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999) (quoting *Helland v. S. Bend Cmty.*

30

*Sch. Corp.*, 93 F.3d 327, 330 (7th Cir. 1996)). In other words, a plaintiff must show that any proffered reasons were either lies or had no basis in fact. *Id.*

There is no dispute that Myszewski, as a woman, is within a protected class. Further, there is no question that she was subjected to an adverse employment action.

Regardless, Wisconsin Aviation contends that because of her absences, Myszewski was not meeting its legitimate expectations. However, the evidence shows that Schroeder told Myszewski shortly after she started that the ability to deviate from scheduled work hours was a perk of her job at Wisconsin Aviation. Moreover, Myszewski's April 2004 performance review stated that her attendance met expectations even though she had worked less than forty hours in six of the sixteen weeks prior to the review.

Nothing suggests that Wisconsin Aviation's standards for attendance tightened over the next year and a half. Schroeder allowed McGuire to come in late twice a week for two months in mid-2004 due to chiropractic appointments before he approached McGuire about his tardiness, and even then Schroeder did not demand that McGuire come in on time. Instead, Schroeder merely asked McGuire to provide more notice. Afterward, McGuire continued to come in late up to September 2005, because he had to get his children ready each morning.

Although Wisconsin Aviation's Employee Handbook required employees to submit Absence Approval Forms, everyone did not adhere to the practice.

Additionally, Stanly found Wisconsin Aviation to be very accommodating toward employees who had last minute needs to leave work early, and saw that employees could come and go if they got their hours in and finished their work. Schroeder informed Stanly when he was hired that Wisconsin Aviation was very flexible.

31

There is also evidence that Harrington came in early Monday through Thursday so he could leave early on Friday, even though he did not have a special arrangement allowing him to do so. And, according to Fenske, he has no recollection of denying an employee's request to leave early between June and September 2005.

Wisconsin Aviation allowed its mechanics to alter their schedules. Therefore, the record shows that it did not expect strict adherence to those schedules. Thus, construing the evidence in Myszewski's favor, her attendance met Wisconsin Aviation's expectations at the time she was terminated. Further, nothing suggests that Myszewski's work as a mechanic was not up to par.

Also, the evidence shows that male mechanics were treated more favorably regarding any attendance requirements that may have existed. Pitterle, Siebel, Veum, Weigand, and Yeager all may have averaged over forty hours per week and worked at least thirty-four weeks of forty hours or more between January and September 2005. However, McGuire, Stanly, Emery, and Ripp were similar to Myszewski when it came to hours worked or deviations from their scheduled hours.

Wisconsin Aviation contends that Emery and Ripp were not similarly situated to Myszewski because Emery was an apprentice and Ripp was part-time. However, the court is not persuaded that evidence indicating that Wisconsin Aviation treated a male apprentice better than a female full mechanic is irrelevant for comparison purposes. There is good reason to believe that an apprentice would have fewer rights or privileges and stricter treatment than a full mechanic. Part-time mechanics, such as Ripp, had the same attendance requirements as full-time mechanics. And Wisconsin Aviation glosses over the similarity between Myszewski and McGuire and Stanly, who were full-time mechanics.

32

McGuire was habitually late. When he began coming in late twice a week for six months during 2004 Schroeder let the situation go for two months then asked McGuire to give him advance notice. During Myszewski's employment at Wisconsin Aviation, McGuire was late 255 of the 296 days he worked, and he worked less than forty hours a week nine times. Yet McGuire was never disciplined for last-minute absences or tardy arrivals.

Twice, Emery left work prior to the end of his shift without letting a supervisor know that he was leaving. He received verbal discipline the second time, yet his discipline regarding attendance did not progress farther even though in one week during July 2005 he was late for work four times. Fenske did not recommend that Schroeder discipline Emery for that tardiness.

In contrast, Myszewski, who on September 14, 2005, had been advised by Schroeder that she had permission to leave and informed Fenske she was leaving, was the sole mechanic who received a written warning or was terminated for attendance issues during the period. Male mechanics such as Stanly and McGuire were assumed to have some special agreement with the company such that their schedule deviations were overlooked, whereas Myszewski received written discipline and was terminated.

Emery averaged 37.8 weekly hours between June 1 and September 14, 2005, working less than forty hours a week during eight of those weeks. Between the end of June 2005 and mid-September 2005, Myszewski averaged 37.2 weekly hours, and also worked less than forty hours in eight of the weeks between June 1 and September 14. Their hours were comparable, yet Myszewski, the woman and a full mechanic, was terminated. On the other hand, Emery, the man and an apprentice, was not terminated.

33

Wisconsin Aviation contends that its legitimate reason for firing Myszewski was her attendance, but, as just discussed, that reason is not legitimate, inasmuch as Wisconsin Aviation had a flexible, lenient attendance policy. Further, Myszewski has provided evidence of pretext. Although Wisconsin Aviation maintains that Myszewski received two verbal warnings and a written warning before termination, Myszewski, who must be believed at this stage, says no such verbal warnings occurred.[25] The written documentation of the purported verbal warnings did not appear in Myszewski's personnel file in the human resources department until *after* her termination, thereby suggesting that Wisconsin Aviation wrote them after the fact.

Further, Wisconsin Aviation cited as the final straw Myszewski's early departure on September 14, although she had been given permission to leave early by Schroeder and her early departure was anticipated and shown on the shop calendar. That Myszewski did not mention to Schroeder during their meeting on September 15 that she had permission to leave work early does not alter the fact that she was given permission to leave early.

Wisconsin Aviation's untruths to the Wisconsin Unemployment Office draw into question its motives. Schroeder and Seeber provided that office with correspondence stating that Myszewski left without permission on September 14, when she had not, and that she refused to make up hours, which she did not. Moreover, the correspondence stated that Myszewski failed to abide by the lunch hour schedule set forth in her written

---

[25]That the verbal warnings were mentioned in the written warning does not mean they were given. Myszewski's signature on a written warning merely evidences that she read and understood it, not that she agreed with its contents.

34

warning, when Schroeder had adjusted that lunch schedule and Myszewski had not violated it.

Schroeder's credibility is drawn further into question because he says he spoke with Seeber prior to terminating her, yet Seeber says she was not so informed. Additionally, Schroeder explains his laxity regarding McGuire's tardy arrivals citing an agreement he had with McGuire, yet McGuire says there was no such agreement. Schroeder says he disciplined employees who were habitually late verbally, yet he did not discipline McGuire or Emery verbally.

Notably, Wisconsin Aviation has dropped the lunch-hours issue. This is telling inasmuch as "[a]n employer's shifting explanations are evidence that its stated reasons did not truly motivate the adverse action and that an impermissible one actually did." *Brunker v. Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1007 n.1 (7th Cir. 2009).

Baum, the president of Wisconsin Aviation, told his human resources manager less than a year after Myszewski was fired that compliance with employment laws was not important to him and that he did not want Serrano to spend her time correcting such issues because he had escaped any ramifications up to that point. It is unlikely that Baum's position in August 2006 differed substantially from his position in 2005 when Myszewski was fired. Notwithstanding Wisconsin Aviation's statements in its Employee Handbook regarding equal opportunities, the record suggests that top management did not believe that compliance with anti-discrimination laws was important.

Lastly, whether Myszewski complained to management about alleged discrimination does not factor into the summary judgment analysis. She has provided enough evidence of discrimination to get to trial.

35

CONCLUSION

For the foregoing reasons,

IT IS ORDERED that Wisconsin Aviation's motion for summary judgment (Doc. 37) is denied.

IT IS ORDERED that a status conference is set for February 25, 2010, at 11:30 AM, to discuss possible mediation of this case and to set final pretrial conference and trial dates.

Dated at Milwaukee, Wisconsin, this 22nd day of January, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

36